# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

JOY PHILLIPS,                                )
                                             )
            Plaintiff,                       )
                                             )
      v.                                     )      NO. 3:15CV527-PPS
                                             )
CITY OF SOUTH BEND,                          )
                                             )
            Defendant.                       )

## OPINION AND ORDER

Joy Phillips was a police officer with the South Bend Police Department, and
after suffering alleged discrimination, sexual harassment, and retaliation, she resigned
from the SBPD, on July 26, 2016, after 17 years with the force.  Phillips then brought this
lawsuit, arguing that she was passed up for a promotion because she was a woman, that
she was subjected to sexual harassment, and that she was unfairly disciplined and
retaliated against after filing an EEOC charge and complaining of discrimination.  I
granted summary judgment on Phillips' claims of sexual harassment and failure to
promote.  Phillips' claim of retaliation went to trial, and the jury returned a verdict in
Phillips' favor, awarding her $35,000 in compensatory damages.

Phillips now seeks equitable relief in addition to the compensatory damages
awarded to her by the jury. I held an evidentiary hearing to allow the introduction of
additional evidence on the equitable relief question.  Based on all of the evidence before
me, I conclude that Phillips is entitled to equitable relief in the form of back pay and

front pay, as well as prejudgment interest, as described more fully below.

## Background

Joy Phillips served as a police officer for the City of South Bend from April 19, 1999 to July 26, 2016.  She most recently held the rank of Patrolman First Class.  In the Spring of 2015, Phillips sought a promotion to the rank of Sergeant and was one of 15 candidates who applied.  Phillips was passed over in favor of three men who got the positions.  She claimed that this failure to promote was an act of gender discrimination.  Phillips also made claims of sexual harassment.  I granted summary judgment in favor of the City on those two claims but allowed the case to proceed to trial on her retaliation claim.

Here is what the evidence showed: Phillips filed a Charge of Discrimination with the EEOC on October 23, 2014.  Following this date, there was a dramatic increase in the number of investigations and disciplinary actions brought against Phillips.  Prior to her filing of the charge of discrimination, Phillips was the subject of three administrative investigations during the preceding 14 years on the force. But from October 23, 2014 until March 2, 2016, when she was relieved of duty, Phillips was the subject of a whopping 12 administrative investigations, resulting in seven imposed or proposed disciplines.

The details of these investigations and disciplines were the subject of much of the trial testimony.  The jury heard about the number of Internal Affairs investigations into Phillips' conduct as an officer following her EEOC charge as compared to before her EEOC charge, which, as noted above, was three investigations in 14 years versus 12

investigations in 16 months. Phillips testified that she was investigated or disciplined for the same actions she had taken without issue in the past, but suddenly, following the EEOC charge, this same conduct resulted in disciplinary investigations or actions.

Phillips further testified that other officers engaged in the same exact conduct for which she had received discipline, but the other officers were not disciplined. For example, Phillips was informed on October 28, 2015 of violating policy by disregarding other officers from a Shot Spotter alert by telling other officers not to respond to a report of gunshots fired. Phillips was given a letter of reprimand even though, according to Phillips, this was a common practice in the department. Other officers involved in this same incident were counseled, but not formally disciplined. [DE 107 at 58-59.]

The jury also heard testimony about several instances in which Phillips was disciplined for conduct that had occurred many months, and in some cases more than a year, prior to the SBPD opening an investigation. Importantly, Phillips' conduct at issue had occurred before her EEOC charge, yet the investigation or discipline took place after the EEOC charge. For example, Phillips testified about a five-day suspension she received for allegedly defaming a police officer candidate six weeks after she filed the EEOC charge, even though the conduct occurred before the filing. [*Id.* at 11-17.] Several of the investigations into her conduct lasted well over the 60 days called for in the police officers' collective bargaining agreement with the City, including ones that were left open and hovered over her for 441 days, 305 days, and 171 days. [*Id.* at 11-17,

33, 49.]

In addition to the lengthy duration of the investigations, Phillips also testified as to some other suspicious circumstances surrounding the investigations, which occurred following the EEOC charge, including lost evidence of her interactions with civilians [*id.* at 21-22 ] and a complete change in the attitude of her superiors towards the credibility of the allegations against her [*id.* at 20]. The jury further heard a tape recording of a conversation between her superior Sergeant Mullins and Phillips which served as the basis for a five-day suspension that Phillips received for insubordination. On the tape recording, Phillips asked Mullins if she needed to speak to another officer about an issue, to which Mullins said that it was not necessary because he had already done so. Because she did not interpret this as a direct order, she later spoke with the other officer. [*Id.* at 63-65.] Phillips was nonetheless disciplined for violating this supposed order.

Phillips testified that she knew her fellow officers were looking for her to fail. In support, she testified that she was either investigated or disciplined for a myriad of nitpicky or otherwise phony charges. For example, she was accused of allegedly defaming an officer when she complained about him making sexually inappropriate comments towards her. [*Id.* at 32-33]. So instead of the harassing officer getting into hot water, it was Phillips who found herself on the bad end of a grievance. There was another investigation related to a conversation her *husband* had at a bar in Chicago with a SBPD officer. [*Id.* at 34-35]. She was brought up on charges for responding to a call

related to her duties as a hostage negotiator in a manner she had done many times in the past. [*Id.* at 47]. She was investigated for failing to submit a corrected a police report before she clocked out, when the reviewing officer denied her submission after her shift had ended (for which she received a three-day suspension). [*Id.* at 77-79]. And she was further investigated for failing to collect syringes related to an overdose and, then when she did collect them, submitting them into evidence when there had been no crime committed (for which she received a one-day suspension). [*Id.* at 72-74].

Finally, Phillips testified about the most serious discipline imposed on her. Chief Ruszkowski accused Phillips of making contact with a barricaded subject without having been called to the scene by Dispatch or a commander. Phillips claimed that she had communicated by text message and by phone with the officer on the scene and with the commander of the Hostage Negotiation Team, and that they were aware that she was going to speak to the barricaded person. In order to prove her claims, Phillips requested the tapes of the Dispatch records. However, because she didn't get the Chief's approval to request the tapes, she was disciplined. [*Id.* at 38-48.]

Phillips was ultimately relieved of duty on March 2, 2016, when Chief Ruszkowski summoned Phillips to his office and gave her charges that totaled a 54-day suspension without pay and removal from the Hostage Negotiation team. When Phillips refused to sign the documents acknowledging receipt, Ruszkowski relieved her of her duties indefinitely with pay. Although she continued to receive her salary, she was no longer able to collect substantial overtime pay for which she had grown

accustomed to over the years.[1]  What's more, she was actually prohibited from leaving

St. Joseph's County and from continuing with training that was necessary to maintain

certain certifications she held as a police officer.  She was also required to turn in her

badge and weapon.  [DE 109 at 19.]

Phillips appealed the suspensions and reprimands. The one, three, and five-day

suspensions were upheld.  Phillips also appealed the lengthiest of her suspensions (45

days) to the Board of Public Safety, which may review discipline exceeding a five-day

suspension, but before a hearing took place, Phillips resigned from the SBPD saying she

just couldn't take the retaliation any longer.  She soon began working for the Elkhart

Police Department, where she has since been promoted to Investigator.

At trial, the City attempted to rebut Phillips' claims that these investigations and

disciplinary actions constituted retaliation.  It pointed to a new policy of increased

oversight and discipline at the SBPD brought on by new leadership.  It explained that

the reason for the delay in disciplining Phillips was due to unexpected staffing

disruptions, including the resignation of the Internal Affairs Investigator. The City also

presented evidence that Phillips had committed the infractions at issue, and they were

based on legitimate, non-retaliatory reasons.  According to the City, all of the

disciplines recommended against Phillips were based on verifiable violations of the

SBPD Duty Manual and General Orders.  They claimed that her relief from duty was

---

[1]Although, the City has presented evidence suggesting that Phillips did work
some overtime, involving court appearances, after she was relieved of duty. [DE 118.]

not retaliation but rather personnel management.

A jury disagreed with the City and found in favor of Phillips, awarding her $35,000 in compensatory damages on her claim of retaliation.

## Discussion

A victim of discrimination in violation of Title VII is presumptively entitled to complete relief. *Hutchison v. Amateur Elec. Supp., Inc.*, 42 F.3d 1037, 1044 (7th Cir.1994) (citing *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418,(1975)). In that regard, a successful Title VII plaintiff may obtain appropriate injunctive relief, which may include (but is not limited to) reinstatement or hiring, with or without back pay, "or any other equitable relief as the court deems appropriate." *See* 42 U.S.C. § 2000e–5(g). Where reinstatement is not appropriate, courts may order front pay as an equitable substitute for reinstatement. *See Downes v. Volkswagen of Am., Inc.*, 41 F.3d 1132, 1141 (7th Cir. 1994).

### *Eligibility for Back Pay/Constructive Discharge*

Once the jury has found that there has been employment discrimination, there is a presumption that the employee is entitled to back pay. *David v. Caterpillar, Inc.*, 324 F.3d 851, 865 (7th Cir. 2003). The purpose of back pay is to put the plaintiff in the same position she would have been if the discrimination had not occurred. *Harper v. Godfrey, Co.*, 45 F.3d 143, 149 (7th Cir. 1995). The plaintiff must establish the amount of damages, but she is presumptively entitled to full relief. *Hutchison*, 42 F.3d at 1044. Back pay extends from the date of the adverse employment action until the date of judgment. *See*

*Ortega v. Chi. Bd. of Ed.*, 280 F. Supp. 3d 1072, 1099 (N.D. Ill. 2017) (citing *McKnight v. General Motors Corp.*, 973 F.2d 1366, 1369 (7th Cir. 1992)).

At the outset, there is a disagreement between the parties as to whether Phillips is entitled to any back pay at all.  The City says that Phillips voluntarily resigned from the police force, which precludes any recovery of back pay.  Phillips says she was constructively discharged.  Obviously, the jury found in Phillips' favor finding that she had been retaliated against.  But the jury never expressly said that the retaliation Phillips experienced was in the form of a constructive discharge. The problem is that no one asked for a special verdict on this point, and I didn't propose one myself. As the City would have it, the retaliation could have been two other employment actions – a five-day suspension or her relief from duty.  Phillips unsurprisingly argues the opposite — that the jury implicitly found that she was constructively discharged.  I am required to make equitable findings that are consistent with the jury's resolution of the issues implicitly reflected in its general verdict.

Phillips' entitlement to back pay depends on whether she was constructively discharged, as a plaintiff "must show either an actual or constructive discharge in order to receive the equitable remedy of reinstatement, or back and front pay in lieu of reinstatement." *Hertzberg v. SRAM Corp.*, 261 F.3d 651, 659 (7th Cir. 2001).  In the absence of such a showing, the exclusive remedies are compensatory and punitive damages, though here, the exclusive remedy would be only compensatory damages, as punitive damages are not available against a municipality.  *Id;* 42 U.S.C. § 1981a(b)(1).

"[I]n order to state a claim for constructive discharge, a plaintiff needs to show that her working conditions were so intolerable that a reasonable person would have been compelled to resign." *Chambers v. Am. Trans Air, Inc.*, 17 F.3d 998, 1005 (7th Cir. 1994). To be actionable, the conduct at issue must have the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment. *Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 735 (7th Cir. 2001).

Having considered the jury's verdict and the evidence from both the trial and the equitable remedies hearing, as well as the post-trial briefing, I find that there is sufficient evidence that Phillips was constructively discharged. First, after filing her charge of discrimination with the EEOC, Phillips was bombarded with disciplinary actions, many of which were downright silly. There was ample testimony at trial that, as a result of the many disciplines that Phillips received, the conditions at the SBPD for Phillips had become intolerable based on her inability to adequately perform the functions of her job, her decrease in income, and the restrictions placed on her by virtue of her being relieved of duty.

Phillips credibly testified at length about the effects that the constant discipline had on her ability to do her job. Phillips testified that she felt her "life was put at stake" when she "stopped receiving backup." According to Phillips, her fellow officers "wouldn't go to calls with me anymore because I had to record everything. They didn't want to be part of any [Internal Audit] to deal with me." [DE 107 at 94.] Phillips

9

described the Internal Audit process as a "limbo situation" in which officers were stressed out. [*Id.* at 27-28.] Because she was forced to respond to these Internal Audits so frequently, she wasn't able to do her job, and she started second-guessing herself. [*Id.* at 75.]

Even when the charges against her were not sustained, she started wondering if she should even work anymore. She felt that she couldn't do anything right. [*Id.* at 76.] Phillips testified that, as a result of the many Internal Audits she received, she started hesitating on calls, which she called "the kiss of death being a police officer because you hesitate, it could cost you your life." [*Id.* at 94.] Phillips testified that "[y]ou can't return to a job when you have to worry about whether or not you are coming home in the morning." [DE 109 at 19.] She also testified that she was "forced out" and that she "couldn't function as a police officer." [*Id.* at 18.]

I find this testimony particularly compelling. Given the dangers inherent in being a police officer, the constant fear that she would be unfairly disciplined and that other officers would not provide backup makes it extremely likely that she would not be able to adequately fulfill her duties as police officer. Having to worry about whether her life was at stake certainly makes her working conditions intolerable.

In addition to the effects of the discipline she faced, Phillips also experienced a loss in income after being relieved of duty, which made it difficult to maintain her standard of living, and she faced severe restrictions on her ability to travel and maintain certain certifications. When asked why she resigned from the SBPD, Phillips testified

that she was the breadwinner of her family and that the extra work beyond her patrol work subsidized her lifestyle. After being relieved of duty, she was not able to work any overtime or in the security field (though as I mentioned before, Phillips did work a small amount of overtime related to court appearances). [DE 107 at 90-91.] Following her relief from duty, Phillips' family "fell on very financial hardships" and they "couldn't afford to survive anymore." [DE 109 at 18-19.]

There's more. As noted above, under the terms of her relief from duty, Phillips was not permitted to leave St. Joseph County, despite the fact that much of her family lived outside of the county. [DE 107 at 92.] That strikes me as an odd and particularly odious requirement to place someone under: leave the county and you don't get paid. There was also evidence that Phillips wasn't able to continue with training that was necessary to maintain certifications as a police officer. [DE 109 at 19.]

In addition to the testimony presented at trial and the post-trial hearing, I am persuaded by the jury's verdict. Although it was a general verdict in favor of Phillips, the jury found in her favor nonetheless. I can't ignore that fact. I am required instead to render an equitable relief ruling that is consistent with what the jury decided. *Miles v. Indiana*, 387 F.3d 591, 599 (7th Cir. 2004) (citing *Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.*, 585 F.2d 281, 844 (7th Cir 1978)). The jury awarded Phillips $35,000 for her pain and suffering – a sum that is, in my view, simply too large to support the City's contention that the jury found she was retaliated against only on the basis of a five-day suspension and a paid relief of duty.

It's also notable that the jury was expressly instructed that Phillips had put forth a constructive discharge claim. I laid out the essential elements of the claim, and in explicit terms, I told the jury that to establish the constructive discharge claim, Phillips must prove that the City made her working conditions "so intolerable that a reasonable person in Phillips' position would have had to quit" and that the City "would not have made Phillips' working conditions so intolerable had Phillips not filed an EEOC complaint or this lawsuit but everything else had been the same." [DE 84 at 18.]

I acknowledge that it is possible, as the City argues, that the jury rejected Phillips' constructive discharge claim but nonetheless found that Phillips suffered a materially adverse employment action on the basis of other disciplinary measures. The constructive discharge instruction explained that constructive discharge was but one example of a materially adverse employment action. So it's conceivable that the other disciplinary measures imposed by the SBPD on Phillips — a five-day suspension and her being relieved of duty with pay — served as the basis for the jury's finding of unlawful retaliation. But I don't think that is likely.

Although I am bound by the issues necessarily decided by the jury, when the basis of the jury's verdict is unclear, and the jury may have supported its verdict by finding in the plaintiff's favor on any one of the issues, I am free to determine the basis of the verdict unless extrinsic evidence clearly resolves the issue. *Miles*, 387 F.3d at 600. It strikes me that it is much more probable that the jury, having been instructed on constructive discharge and awarding Phillips nearly half of her annual salary, found

Phillips' testimony credible and agreed that she had been constructively discharged. In any event, based on the foregoing and the weight of the evidence at trial, I independently find that Phillips was constructively discharged and is thus entitled to back pay and front pay.

### *Calculating Backpay*

Phillips seeks $34,822.92 in back pay, while the City contends that her award should be much smaller. "Complete relief for a victim of discrimination generally will include an award of back pay; indeed, such an award is presumptively proper once a violation has been shown." *Equal Emp't Opportunity Comm'n v. Ilona of Hungary*, 108 F.3d 1569, 1580 (7th Cir. 1997). Back pay represents the wages the plaintiff would have earned had she not been fired. *See* 7th Cir. Pattern Civil Jury Instruction 3.11 (2015). Included in this calculation are any benefits she would have received from the defendant if she had not been terminated. *Id.* "Liability for back pay begins at the time that the adverse employment action causes economic injury and continues through the date judgment is entered in the plaintiff's favor." *Ortega*, 280 F. Supp. at 1080-81 (internal quotation marks and brackets omitted).

Phillips urges the Court to focus on her 2015 earnings at the SBPD as the starting point in calculating back pay. She notes that from 2010 to 2015, her pay increased $18,584.52. Over a five-year period, that increase averages to $3,716.90 per year. Phillips believes that the proper way to calculate back pay is to use her 2015 earnings and add this amount ($3,716.90) to her actual 2015 earnings to estimate what her 2016

earnings at the SBPD would have been, and twice this amount ($7,433.80) to estimate

her 2017 earnings.  Here are her past earnings at the SBPD:

| Year | Yearly Earnings at SBPD |
|------|-------------------------|
| 2010 | $61,442.26 |
| 2011 | No information available. |
| 2012 | $57,402.85 |
| 2013 | $66,637.39 |
| 2014 | No information available.[2] |
| 2015 | $80,026.78 |
| Partial Year 2016 (Jan. 1, 2016 - July 26, 2016) | $43,147.80 |

The City disagrees with this starting point and provides a few alternatives to

calculating what she could have expected to earn at South Bend in 2016, 2017, and 2018.

The City points to the base pay for a patrolman in Elkhart versus the base pay of a

patrolman in South Bend.   In the alternative, the City argues that Phillips' average pay

over the four years for which she provided data – $66,377.32 – is more accurate because

2015 was an outlier in terms of the amount of overtime available at the SBPD.

I'll admit that there is some uncertainty in what Phillips would have earned for

_____

[2]In a recent filing with the Court, Phillips has provided her 2014 compensation as $74,570.20. [DE 123.]  The source for this information is a public information website. However, in this filing, Phillips also provides her compensation for 2012, 2013, 2015, and 2016, and these numbers are different than the W-2s she has previously submitted to the Court.  Because of this discrepancy, and the lack of a W-2 submitted for 2014, I will not consider the numbers she has presented in this recent filing.  Phillips' W-2s are the most reliable source of information regarding her income.

the second half of 2016, 2017, and the first few months of 2018 had she stayed at the

SBPD.  That's because Phillips' income depended not only on her base pay, which is

easily determinable, but also, as I mentioned earlier, on the substantial amount of

overtime that Phillips claims to have worked.  Indeed, according to testimony at the

hearing, Phillips' actual salary was significantly higher than the base pay for an officer

of her rank.  And Chief Ruszkowski testified that overtime was mostly irregular and

could be affected by the availability of certain grants, the time of year, the number of

officers, and a whole host of other factors.

However, when confronted with "uncertainty which clouds the task" of

computing a back pay award, the Seventh Circuit has "set down three general rules: (1)

unrealistic exactitude is not required; (2) ambiguities in what an employee ... would

have earned but for discrimination should be resolved against the discriminating

employer; [and] (3) the district court, far closer to the facts of the case than [the Court of

Appeals] can ever be, must be granted wide discretion in resolving ambiguities."

*Stewart v. Gen. Motors Corp.*, 542 F.2d 445, 452 (7th Cir. 1976).  It is with these rules in

mind that I conduct my analysis.

In arguing against using Phillips' 2015 income as the starting point for any

award, the City first says that I should look to the base pay rates for first class

patrolmen in the SBPD and compare them to those in Elkhart.  However, this

comparison fails to account for specialty pay, shift differential pay, and substantial

overtime that Phillips did work, and could continue to expect to work, in South Bend.

15

Indeed, Phillips worked 369.75 hours of overtime in 2015, which she says accounts for about 15% of her regular hours. [DE 117-1.] Therefore, comparing the base pay rate does not adequately "recreate the conditions and relationships that would have existed in the unlawful discrimination had not occurred." *See United States v. City of Chi.*, 853 F.2d 572, 575 (7th Cir. 1988). No matter how it was earned, her salary, including overtime, was still income that Phillips could reasonably have expected to make if she had stayed at the SBPD.

In support of its alternative argument, that I should average the incomes from all of the years for which Phillips provided her W-2s, the City points to the testimony at the hearing concerning the abundance of overtime available in 2015. It is true that there was some testimony at the hearing that 2015 was an outlier year with above-average overtime opportunities available to patrol officers. Chief Ruszkowski testified that it was an exceptional year for shortages in patrol and overtime spending on police officers. The City argues that it's not likely that her 2015 income would be replicated in future years.

Yet Phillips' earnings in the first part of 2016 tell a different story. Phillips worked for the SBPD for just shy of seven months in 2016, and she had already earned $43,147.80, despite having been relieved of duty on March 2, 2016. If this income trend had continued, Phillips could have expected to earn nearly $74,000 in 2016 ($43,147.80 ÷ 7 months = $6,163.97/per month x 12 months = $73,967.66). But importantly, this trend does not even account for the fact that she was relieved from duty and earned minimal

overtime from March 2nd through her last day on the job in July. (As I noted earlier, as a result of the relief from duty, Phillips was not permitted to work any overtime, though recent filings by the parties suggest she did work some hours.) Phillips has also submitted evidence showing in 2016, she had already worked 45 hours of overtime. [DE 117.] So this income reflects the fact that her relief from duty prohibited her from working overtime after March 2, 2016.

Moreover, the testimony at the hearing suggested that there was a significant amount of overtime available during the summer months because of officers' vacations, making it likely that Phillips would have worked additional overtime after March 2, 2016 through the date of her constructive discharge and onward, had she not been relieved of duty or constructively discharged. The amount of Phillips' earnings, accounting for her relief of duty, show that she was likely on track to earn a substantial amount of income. In addition, although Chief Ruszkowski testified that 2015 was an exceptional year, he also testified that the SBPD is still short staffed in the department, albeit not in patrol.

I also cannot accept the City's contention that I should average her income from 2010, 2012, 2013, and 2015. The City would have me consider income from 2010 – eight years ago. I don't see how income from this long ago can be a reliable indicator of what she would have earned in 2016, 2017, and 2018.

In the end, I find both Phillips' and the City's suggestions to be flawed. Phillips' proposed methodology leads to a future expected income that strikes me as

unattainable.  I have no trouble concluding that it is unlikely that Phillips would have earned more than $100,000 in just a few years, or nearly $170,000 by her retirement date, as Phillips' brief suggests, considering that just five years ago she earned less than $60,000.

A better approach that adequately accounts for all of the shortcomings identified above is available.  As a starting point, I will compare the base pay for a first class patrolman in the SBPD in 2013 through 2016 to the actual salary that Phillips received in those years.  I am choosing 2013 because, as I said above, 2010 is too long ago.  2013 is a reasonable year to serve as the initial reference point since using 2013, 2015 , and 2016 will provide three years of data.  (As explained earlier, Phillips did not provide her 2014 W-2s.) Comparing the base pay to Phillips' actual salary will tell me how much of Phillips' income was attributable to overtime and specialty pay.  It will also tell me what multiplier I should use going forward in order to estimate how much more than the base pay Phillips could have actually expected to earn.  I will average this multiplier calculated from each year to come up with a multiplier to be applied to the years after 2015.  This average is a reasonable estimate of the amount of overtime and specialty pay that Phillips could have expected to earn in the remainder of 2016, all of 2017, and the first four months of 2018.  Utilizing this method means that my award of back pay is tied to the actual salary of a SBPD police officer and also provides a reasonable estimate of the amount of overtime and specialty pay that Phillips could have expected to earn based on more historical data than a possibly exceptional year.  Here are those

numbers:

| Year | First Class Patrolman Annual Base Pay | Phillips' Actual Earnings | Multiplier to Calculate Actual Earnings[3] (Base Pay · $x$ = Actual Earnings) |
|---|---|---|---|
| 2013 | $51,818 | $66,637.39 | 28.6% |
| 2014 | $53,113 | No information available. | Not applicable. |
| 2015 | $54,281 | $80,026.78 | 47.43% |
| 2016 | $55,475 (full year) / $31,375.20 (pro-rated from Jan. 1 to July 26, 2016)[4] | $43,147.80 (from Jan. 1 to July 26, 2016) | 37.52% |

If I average the four figures in the last column above, the average multiplier to calculate Phillips' actual pay based on the annual base salary for a first class patrolman in South Bend is 37.85%. I will use this factor as a multiplier to the actual base pay salaries that South Bend has approved for 2016, 2017, and 2018 to calculate what Phillips could have expected to earn.

---

[3]The multiplier is the factor used to get from base pay to Phillips' actual earnings. For example, here is how it works for 2013: $51,818 (base pay) x 1.286 = $66,637.39 (Phillips' actual earnings).

[4]Phillips worked for the SBPD for 207 days in 2016 – from January 1, 2016 to July 26, 2016. Dividing the base salary by 366 – since 2016 was a leap year – yields a daily income of $151.57. The daily income should then be multiplied by 207 days to determine Phillips' base pay for 2016. Running these numbers, her base salary for the first 207 days was $31,375.20.

| Year | SBPD Base Pay | Phillips' Expected Yearly Salary at SBPD | Phillips' Earnings at Elkhart |
|------|---------------|------------------------------------------|-------------------------------|
| 2016 | $55,475 | $76,742.29 (full year) / $33,331.04 (pro-rated from July 27, 2016 to Dec. 31, 2016)[5] | $31,214.20 (actual income July 27, 2016 to Dec. 31, 2016) |
| 2017 | $56,861 | $78,382.89 | $65,620.84 |
| 2018 | $57,998 | $79,950.24 (full year) / $26,650.28 (pro-rated from Jan. 1, 2018 to May 1, 2018) | $23,258.21 (estimated based on 2017 salary plus 6.33% raise) |

With these numbers in mind, I turn to the calculations. For 2016, the base pay for a SBPD first class patrolman was $55,475. Multiplying the South Bend base salary by the overtime multiplier means that Phillips could have expected to earn $76,742.29 in 2016. Phillips actually earned $31,214.20 from Elkhart and $43,147.80 from South Bend, totaling $74,362 for 2016, for a difference of $2,380.29 in back pay in 2016.[6]

In 2017, Phillips' expected salary at South Bend is $78,382.89, which represents a base salary of $56,861 multiplied by the overtime multiplier. Phillips actually earned $65,620.84 at Elkhart. Therefore, she is entitled to $12,762.05 in back pay for 2017.

---

[5] To calculate this number, I have divided the expected year salary of $76,742.29 by 366 days in 2016, and then multiplied by 159 days from July 27, 2016 to December 31, 2016.

[6] Philips did not provide any information as to how much overtime pay she lost from the time she was relieved of duty until her constructive discharge. Therefore, it is not possible to calculate back pay for these months. As a result, my back pay calculations utilize her constructive discharge as the proper starting point.

Back pay for 2018 extends from the beginning of the year until the date of judgment, which I expect will be May 1, 2018 – exactly four months. Phillips could have expected to earn $79,950.24 based on the first class patrolman salary in South Bend of $57,998 multiplied by the overtime factor. Dividing this number by 12 in order to obtain her expected monthly income comes to $6,662.57. To account for the first four months of the year, until judgment is entered, I multiply this monthly expected salary by four for a total of $26,650.28. Although Phillips has not submitted any pay stubs for 2018, I will use her 2017 as a reasonable estimate of her 2018 income. However, I must also account for the fact that the City of Elkhart has approved a 6.33% raise for Investigators, Phillips' current position. Using her 2017 income and accounting for the City's raise, and then also pro-rating her yearly salary to four months, Phillips' likely 2018 income at Elkhart is $23,258.21. Subtracting this likely 2018 income received from Elkhart from her anticipated 2018 income at South Bend, Phillips is entitled to $3,392.07 in back pay for the first four months of 2018.

Adding these three numbers together, Phillips should be awarded $18,534.41 in back pay from the time she was constructively discharged until the date of judgment on May 1, 2018.

One final issue related to back pay must be addressed. Although Phillips' post-hearing brief seems to abandon this argument, at the hearing, Phillips presented evidence that she should be entitled to back pay related to work she had previously done for Notre Dame. Phillips testified that, in the past, while she was an officer with

the SBPD, she worked security and traffic detail during the Notre Dame football games. After a lengthy inquiry at the hearing, it became clear that there are two types of Notre Dame-related overtime. One was simply ordinary SBPD overtime in which officers worked outside the Notre Dame stadium before, during, and after football games. This work was compensated by the SBPD and is reflected on her W-2 from the SBPD. The second type was an arrangement in which SBPD officers were hired by Notre Dame to work on the grounds of the university during football games and were paid by Notre Dame. This income would not be reflected on Phillips' W-2 from the SBPD.

The calculation for Phillips' back pay award encompasses the first type of Notre Dame overtime, but not the second. At the hearing, Phillips testified that she had previously been hired and employed by Notre Dame (the second type of overtime), but that work has dried up for her. She contended that this was due to some malicious behavior by the SBPD. However, I decline to award any back pay on this basis. There is simply no evidence of this. The availability of this work is extremely speculative, and Phillips is not disqualified from being hired and actually working games as an employee of Notre Dame by virtue of her no longer working for the SBPD. Indeed, the Notre Dame Police Chief testified that Elkhart Police Department officers are also hired by Notre Dame, and Phillips agrees; she testified that some Elkhart officers do work for Notre Dame. [DE 112 at 39.] Although Phillips believes that she has been blacklisted by Notre Dame because of the events that occurred at the SBPD, her "belief" is not evidence. So she is not entitled to back pay for her work at Notre Dame.

*Front Pay*

"The goal of front pay is to put the victim in the financial position he should have enjoyed, when circumstances make it inappropriate to direct the employer to promote (or hire) him." *Biondo v. City of Chi., III*, 382 F.3d 680, 691 (7th Cir. 2004). Front pay cannot extend past the time a reasonable person needs to achieve the same or an equivalent position in the absence of discrimination. *Id.* Any award of front pay "must be grounded in available facts, acceptable to a reasonable person and not highly speculative." *Downes*, 41 F.3d at 1142. The plaintiff bears the initial burden of providing the district court "with the essential data necessary to calculate a reasonably certain front pay award," including "the amount of the proposed award, the length of time the plaintiff expects to work for the defendant, and the applicable discount rate." *McKnight*, 973 F.2d at 1372.

Phillips seeks front pay extending until 2032, when she will reach the retirement age of 55. The City argues that front pay is not warranted because Phillips has found comparable employment at the Elkhart Police Department, and in fact she did not miss any work from when she left her employment at the SBPD until she began work in Elkhart. Phillips has also already been promoted to Investigator, and her base salary is now more than it was at the SBPD.

Despite the fact that Phillips has found work as a police officer with the Elkhart Police Department, it's clear from the W-2s she has submitted, that her salary has decreased. For this reason, Phillips is entitled to some amount of front pay. I decline

however to award front pay until her expected age of retirement.  I conclude that three years of front pay is reasonable to put Phillips in the same position she would have been in absent the retaliation.  My conclusion is based on several facts.  Given her promotion, her position now (Investigator) is actually superior to the position she held at the SBPD (Patrolman First Class).  The only difference is that the Elkhart Police Department ultimately pays less because fewer opportunities for overtime are available there than in the SBPD.  However, it is likely that this pay discrepancy will be somewhat alleviated in light of the Elkhart Police Department's having approved a pay increase for its officers and because Phillips' career at the Elkhart Police Department appears to be advancing.

Moreover, the longer the award the more speculative it becomes.  *Hybert v. Hearst Corp.*, 900 F.2d 1050, 1056 (7th Cir. 1990).  Awarding Phillips front pay until her expected retirement age – a period of 14 years – would be highly speculative and could not possibly account for all of the future uncertainties. An award for three years properly balances the need to compensate Phillips with the difficulty inherent in predicting the future.

To calculate front pay, I will employ a methodology similar to that for back pay. The parties have submitted base salaries for a first class patrolman in South Bend through 2020.  The average salary increase per year is about 2%, so I can easily calculate the anticipated base salary for 2021.  I will again use the base salary and multiply by the overtime factor – 37.85% – to come up with a reasonable estimate of what Phillips could

24

have expected to earn in the future.

The Elkhart base salary is more difficult because either Elkhart has not approved police officer salaries for 2019 or beyond, or the parties have not submitted this information. Nonetheless, given that the annual pay raise in South Bend is about 2% per year, this is a reasonable estimate for an annual pay raise for Elkhart as well. After computing the expected base pay for an Elkhart officer, I will then multiply by 9.73%, which is overtime factor based on her 2017 earnings versus the Elkhart base pay for an Investigator in 2017 (base pay of $59,802; Phillips' 2017 W-2 earnings of $65,620.84). Adding these numbers will give an expected future salary for Phillips with the Elkhart Police Department.

After calculating an annual salary that Phillips could have expected to earn at both South Bend, and is expected to earn at Elkhart, I will compute the difference, which is the amount in front pay that Phillips will be awarded. Here are those computations:

| Year | SBPD Base Salary | Phillips' Expected SBPD Salary | Elkhart Base Salary | Phillips' Expected Elkhart Salary | Difference Between Expected SBPD and Expected Elkhart Salaries |
|------|------------------|-------------------------------|---------------------|----------------------------------|---------------------------------------------------------------|
| 2018 | $57,998 | $79,950.24 | $63,591 | $69,778.40 | $10,171.84 |
| 2019 | $59,158 | $81,549.30 | $64,862.82 | $71,173.97 | $10,375.33 |
| 2020 | $60,341 | $83,180.07 | $66,160.08 | $72,597.46 | $10,582.61 |
| 2021 | $61,547.82 | $84,843.67 | $67,483.28 | $74,049.40 | $10,794.27 |

Phillips is entitled to full years of front pay in 2019 and 2020, which totals $10,375.33 and $10,582.61, respectively. However, front pay for 2018 and 2021 must be pro-rated. The front pay for 2018 runs from May 1, 2018 – the anticipated date of judgment – until the end of the year (for a total of eight months); front pay for 2021 ends on April 30, 2021 – three years from the date of judgment (for a total of four months). So for 2018, the front pay amount is $6,781.23, and for 2021 it is $3,598.09.

Front pay calculations must be discounted to present value. Phillips has provided these calculations, albeit with different numbers:

| Year | Front Pay | Discount Value | Present Value |
|------|-----------|----------------|---------------|
| 2018 | $6,781.23 | 1.03 | $6,583.72 |
| 2019 | $10,375.33 | 1.0609 | $9,779.74 |
| 2020 | $10,582.61 | 1.092727 | $9,684.59 |
| 2021 | $3,598.09 | 1.12550881 | $3,196.86 |

Adding these numbers together, Phillips is entitled to $29,244.91 in front pay after discounting to the present value.

### *Early Withdrawal Penalty*

Phillips claims that she is also entitled to an additional $6,100 to cover the 10% penalty she incurred when she withdrew $61,000 from her retirement savings in 2017. According to Phillips, this withdrawal was necessary to cover shortfalls in her earnings. However, that assertion is unsupported by the evidence presented both at trial and at the post-trial hearing.

Phillips testified at the hearing that she found herself in a situation where she

needed to cash in the entirety of one of her retirement accounts in March of 2017

because of the decrease in compensation with the Elkhart Police Department.

According to Phillips, her family had grown accustomed to her income for several

years.  She claims she was left with no other option but to cash in that account in order

to provide for her family.  [DE 112 at 19, 67.] But Phillips did not provide any specific

details about why she needed to cash in all of the account.  Without more information

as to why she was unable to meet her needs on her Elkhart Police Department salary,

and why she needed to withdraw all of the money from the retirement account, the City

cannot be liable for those choices.

### Prejudgment Interest

The parties did not address the question of prejudgment interest even though

prejudgment interest is presumptively available for violations of federal law. *See Shott v.*

*Rush–Presbyterian–St. Luke's Med. Ctr.*, 338 F.3d 736, 745 (7th Cir.2003).  The Supreme

Court has held that "[p]rejudgment interest is an element of complete compensation."

*West Virginia v. United States*, 479 U.S. 305 (1987).  That is because "[m]oney today is

simply not a full substitute for the same sum that should have been paid some time

ago."  *Williamson v. Handy Button Mach. Co.*, 817 F.2d 1290, 1297 (7th Cir. 1987).

The parties didn't agree on a rate; Phillips didn't ask for it; and there is no

methodology included in either parties' brief for how to calculate it.  While it is not

"within the district court's discretion to deny the whole award of interest because of

these calculational ambiguities," *Hutchison*, 42 F.3d at 1047, the failure to even ask for

prejudgment interest is more than a calculational ambiguity. Nonetheless, under Federal Rule of Civil Procedure 54(c), a final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings. Therefore, I will award prejudgment interest and choose the methodology. *Id.* ("It is within the trial judge's discretion to choose ... any other reasonable method.").

To make things simple, I will assume that Phillips received her annual salary as a lump sum at the end of each year in which it was earned and then calculate the interest on each annual salary amount from that date going forward. *See Ortega*, 280 F. Supp. 3d at 1098 (employing this methodology).

Unlike post-judgment interest, "there is no statutory rate of prejudgment interest"; determining an applicable rate is left to the district court's discretion based on individual circumstances, although "the best starting point is to award interest at the market rate, which means an average of the prime rate for the years in question." *Cement Div., Nat'l Gypsum Co. v. City of Milwaukee*, 144 F.3d 1111, 1114 (7th Cir.1998) (citations omitted). The prime rate is currently 4.75%, *see* Selected Interest Rates (Daily), Board of Governors of the Federal Reserve System, https://www.federalreserve.gov/releases/H15/, though it dropped as low as 3.75% in the beginning of 2017, and slowly climbed to the current rate, *see* Bank Prime Loan Rate Changes: Historical Dates of Changes and Rates, Federal Reserve Bank of St. Louis, https://fred.stlouisfed.org/series/PRIME. A reasonable average of the prime rate is therefore 4.25%, which is the number I will use for 2017. For most of 2018, the prime

rate has been 4.50%, and for 2016, it was 3.50%, *id.*, which are the numbers I will use.

| | 2016 | 2017 | 2018 |
|---|---|---|---|
| **Lost Wages** | $2,380.29 | $17,762.05 | $3,392.07 |
| **Interest Period** | July 27, 2016 to Dec. 31, 2018 | Jan. 1, 2017 through May 1, 2018 | Jan. 1, 2018 through May 1, 2018 |
| **Accrued Months** | 5 | 16 | 4 |
| **Rate (compounded monthly)** | 3.50% | 4.25% | 4.50% |
| **Interest** | $34.71 | $1,006.52 | $50.88 |

Thus, Phillips is also entitled to $1,092.11 in prejudgment interest.

**Conclusion**

For all of the reasons above, Phillips is entitled to $48,871.43 in front pay, back pay, and prejudgment interest. This amount is subject to post-judgment interest as provided by 28 U.S.C. § 1961.

The Clerk should enter judgment in favor of Joy Phillips and against the City of South Bend accordingly.

**SO ORDERED.**

ENTERED: May 1, 2018.

 s/   Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT
